**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| WORLDS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:12-CV-10576 (DJC) |
| ) | |
| ACTIVISION BLIZZARD, INC., ) | JURY TRIAL DEMANDED |
| BLIZZARD ENTERTAINMENT, INC. and ) | |
| ACTIVISION PUBLISHING, INC., ) | |
| ) | |
| ) | |
| Defendants. ) | |

**PROPOSED SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF**
**CONCERNING INDEFINITENESS**

## I.      INTRODUCTION

On June 2, 2014, the U.S. Supreme Court issued its decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. ____ (2014).  The Court defined a new legal standard for assessing whether a patent claim is invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2.  The Court expressly rejected the Federal Circuit's standard that a claim term is indefinite only if it is insolubly ambiguous or not amenable to construction.

In the present action, the parties filed claim construction briefs in April and May of 2013 (D.I. 62, 63, 68, 69).  Defendant Activision's briefs explained that several terms of Worlds' asserted patent claims are indefinite, or indefinite if not construed as urged by Activision (D.I. 63 and 69).  Worlds argued to the contrary (D.I. 62 and 68).  Both parties' showings and arguments in this regard were based on the Federal Circuit's standard for indefiniteness that the Supreme Court rejected in *Nautilus* and replaced with the new legal standard.  Accordingly, Activision submits this brief to address its indefiniteness arguments pursuant to the new standard.

## II.      THE NEW LEGAL STANDARD FOR INDEFINITENESS

As noted in Activision's Opening Claim Construction Brief, the Federal Circuit's standard prior to *Nautilus* was, "[o]nly claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005); D.I. 63 at 32.  Worlds' claim construction briefs cited *Exxon Research & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir 2001), and *Energizer Holdings v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006), which were to the same effect.  D.I. 62 at 20-21; D.I. 68 at 14-15.

In *Nautilus*, the Supreme Court expressly rejected this standard and set forth the following new standard, which lowered the bar for showing indefiniteness:

> In place of the "insolubly ambiguous" standard, we hold that a patent is invalid
> for indefiniteness if its claims, read in light of the specification delineating the
> patent, and the prosecution history, fail to inform, with reasonable certainty, those
> skilled in the art about the scope of the invention.

*Nautilus*, Slip Op. at 1.  The Court identified *Datamize* and *Exxon Research & Engineering* as

examples of Federal Circuit decisions that were based on the improper, rejected standard for

indefiniteness.  *Id*., Slip Op. at 12-13 n.9.

The Court noted that the definiteness requirement of Section 112, ¶ 2, "entails a 'delicate

balance'" between competing considerations.  *Id*. at 9 (citation omitted).  "On the one hand, the

definiteness requirement must take into account the inherent limitations of language."  *Id*.  On

the other hand:

> … a patent must be precise enough to afford clear notice of what is claimed,
> thereby "'appris[ing] the public of what is still open to them.'"  Otherwise there
> would be "[a] zone of uncertainty which enterprise and experimentation may
> enter only at the risk of infringement claims."  And absent a meaningful
> definiteness check, we are told, patent applicants face powerful incentives to
> inject ambiguity into their claims.  Eliminating that temptation is in order, and
> "the patent drafter is in the best position to resolve the ambiguity in … patent
> claims."

*Id*. at 10-11 (citations omitted).

The Court found that the Federal Circuit's standard had set the bar too high for finding

claims to be invalid for indefiniteness (and too low for finding claims to comply with the

definiteness requirement):

> It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims;
> the definiteness inquiry trains on the understanding of a skilled artisan at the time
> of the patent application, not that of a court viewing matters *post hoc*.  To tolerate
> imprecision just short of that rendering a claim "insolubly ambiguous" would
> diminish the definiteness requirement's public-notice function and foster the
> innovation-discouraging "zone of uncertainty," against which this Court has
> warned.

*Id*. at 12 (citations omitted).

### III.     CLAIM TERMS AFFECTED BY THE NEW LEGAL STANDARD FOR INDEFINITENESS

Activision's claim construction briefs (D.I. 63 and 69) demonstrated that four claim terms discussed below are either invalid for indefiniteness or indefinite if not construed as urged by Activision.  Activision made this showing pursuant to the rejected "insolubly ambiguous" or "not amenable to construction" standard, which the Supreme Court found set the bar too high for finding indefiniteness.  Because this change in the legal standard makes indefiniteness easier to prove, all of the facts and arguments set forth in Activision's claim construction briefs are equally applicable in showing indefiniteness under the new *Nautilus* standard – namely, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."

A common trait shared by all of the four claim terms that are the subject of Activision's indefiniteness arguments is that the terms do not appear in the shared specification of Worlds' asserted patents.  In the hope of gaining broad coverage for its asserted patent claims, Worlds injected ambiguity into the claims by choosing to use these terms that are not clearly described in the specification.

Activision provides the following explanation to assist the Court's consideration of the relevant claim terms in light of the new *Nautilus* standard.

### A.     "Participant Condition" And "Condition"

The term "participant condition" appears in all asserted claims of the '501 patent, and the similar term "condition" appears in all but one of the asserted claims of the '998 patent.  The following representative claim elements illustrate the context in which these terms are used:

- "wherein the client device does not receive position information of at least some avatars that fail to satisfy a ***participant condition*** imposed on avatars displayable on a client device display of the client device"; '501 patent, claim 1 (emphasis added).

- "wherein the processor does not receive position information associated with at least some of the remote user avatars in the virtual world, each avatar of the at least some of the remote user avatars failing to satisfy a ***condition***" '998 patent, claim 2 (emphasis added).

The terms "participant condition" and "condition" do not appear anywhere in the specification that is shared by Worlds' patents (D.I. 63 at 21) – rather, they appeared for the first time in the claims of the '501 and '998 patents. (Worlds' assertion (at D.I. 62 at 22) that these terms are used in the shared specification of the asserted patents is flatly incorrect.) Accordingly, one must look to Worlds' patent specification for any disclosure that provides support for "participant condition" and "condition" using other words. The only potential support in this regard is a condition that is set by the client – for example, the variable N'. D.I. 63 at 21-24.

If "participant condition" and "condition" are not construed to refer to a condition that is set by the client (as urged by Activision), these terms are indefinite because, when read in light of the specification and the prosecution history, they would fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention. *Nautilus*, Slip Op. at 1. Worlds' proposed constructions for these claim terms highlight the concern about indefiniteness. Worlds' proposed constructions are expressed in terms of things that "affect[] the status or display of an avatar." However, Worlds' position is circular because, in the context of the surrounding language of the patent claims, "participant condition" and "condition" determine whether position information for avatars is received, which affects the status or display of an avatar. In effect, Worlds contends that things that affect the status or display of an avatar should be defined as "things that affect the status or display of an avatar." If these terms are not

construed as proposed by Activision, their scope would be ambiguous and boundless, creating the impermissible "zone of uncertainty" that members of the public could enter only at the risk of infringement about which the Supreme Court warned.  *Nautilus*, Slip Op. at 10-12.

To illustrate this point, "participant condition" and "condition" could potentially be read to embrace, among other things, arbitrary conditions such as the day of the week on which an avatar is being used, or the gender, height, weight, age, ethnicity, and/or species of an avatar or the user of an avatar – despite the fact that none of these potential conditions is discussed in Worlds' patent specification or prosecution histories.  Without some sort of defining boundary, "participant condition" and "condition" are totally malleable so that Worlds could mold these terms to fit any theory of infringement and any accused activities, which is precisely the danger about which the Supreme Court warned in *Nautilus*.

The uncertainty created by the terms "participant condition" and "condition" is similar to the claims at issue in *Broussard v. Go-Devil Mfg. Co. of Louisiana, Inc.*, 3:08-cv-00124, 2014 U.S. Dist. LEXIS 94352 (M.D. La., July 9, 2014).  In *Broussard*, the Court applied the new standard set forth in *Nautilus* and found asserted patent claims to be invalid for indefiniteness. The patents at issue were generally directed to outboard motors for boats, and the asserted claims included the terms "elongated drive housing" and "drive shaft."  *Id*. at *130-134.  Although the patent specifications discussed minimum lengths for the "elongated drive housing" and "drive shaft," they did not provide any limitation on the maximum length.  *Id*. at *134-136.  Because of this failure, the Court found these terms to be impermissibly ambiguous and to have expanded "the reach of Mr. Broussard's Patents well-beyond the scope of his invention."  *Id*. at *134-138.

As in *Broussard*, absent a construction that "participant condition" and "condition" refer to conditions that are set by the client, the claims containing these terms are boundless and

extend far beyond the scope of the alleged inventions described in the specification of Worlds' patents.

### B. "Third User Perspective"

The term "third user perspective" appears in independent claim 2 and dependent claims 3-17 of the '998 patent as follows (emphasis added):

> switch between a rendering on the graphic display that shows the virtual world to the local user from a ***third user perspective*** and a rendering that allows the local user to view the local user avatar in the virtual world

This claim limitation refers to switching between two renderings: (1) "a rendering on the graphic display that shows the virtual world to the local user from a ***third user perspective***," and (2) "a rendering that allows the local user to view the local user avatar in the virtual world."

"Third user perspective" is indefinite because, when read in light of the specification and the prosecution history, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention. *Nautilus*, Slip Op. at 1; *Broussard*, D.I. 132 at *130-134. The claim limitation in which "third user perspective" appears states that (1) the rendering that shows the virtual world from the "third user perspective" is different from (2) the rendering that allows the local user to view his or her local user avatar. "Third user perspective" in this context is not just ambiguous, it is nonsensical. Whatever the "third user perspective" is, the claim limitation specifies that it is different from a perspective where the local user can view his or her local user avatar. Such a scenario is not described by the specification or prosecution history of the '998 patent, nor is it even possible to conceptualize.

As explained in Activision's Opening and Responsive Claim Construction briefs (D.I. 63 at 34-36; D.I. 69 at 20-22), the specification does not use or explain the term "third user perspective," and the term has no ordinary meaning. In this respect, the recent decision in *Light Transformation Techs. LLC v. Lighting Sci. Group Corp.*, 2014 U.S. Dist. LEXIS 94090 at *26-

31 (E.D. Tex. July 10, 2014), is instructive.  In that case, in its claim construction opinion and order, the Court applied the *Nautilus* standard and concluded that the term "axis of light direction" was indefinite.  According to the Court, there was no ordinary meaning for the term because "light propagates in three-dimensions on an infinite number of axes."  *Id.* at *28. Furthermore, because the specification depicted "numerous exemplary axes of light directions for any given viewpoint ... a person of ordinary skill in the art would be unable to determine which one of these exemplary axes is the "axis of light direction."  *Id.* at *28-29.

Similarly, although the specification here contains some discussion of rendering views from the perspective of a user (*e.g.*, '690 patent at 3:18-25), there is no way for a person of ordinary skill in the art to determine what perspective constitutes a "third user perspective."  For this reason, the claims containing this phrase are indefinite.

**C.     "A Rendering In Which All Of A Perspective View Of A Local User Avatar Of The Local User Is Displayed"**

The term "a rendering in which all of a perspective view of a local user avatar of the local user is displayed" appears in independent claim 19 of the '998 patent as follows (emphasis added):

> switch between a rendering in which ***all of a perspective view of a local user*** avatar of the local user is displayed and a rendering in which ***less than all of the perspective view*** is displayed

The phrase "all of a perspective view" is similar to the phrase "third user perspective" in that it is not used in the specification and has no ordinary meaning.  There is no basis on which a person of ordinary skill in the art can determine how much of a particular view must be displayed in order to constitute all of a perspective view, or what constitutes less than all of that same view, as opposed to an entirely different view.  Thus, when read in light of the specification and the prosecution history, the term fails to inform, with reasonable certainty, those skilled in

the art about the scope of the invention.  *Nautilus*, Slip Op. at 1; *Light Transformation Techs. LLC*, 2014 U.S. Dist. LEXIS 94090 at *28-29.

Worlds tries to ignore this deficiency by arguing that "all of the perspective view" is simply the entire field of view of the local user.  D.I. 62 at 26-29 and D.I. 68 at 23-24.  This argument, however, merely begs the question of what the entire field of view of the user is.  As discussed in Activision's Opening and Responsive Briefs (D.I. 63 at 36-38; D.I. 69 at 22-23), replacing "perspective view" with "field of view" is not supported by the specification, nor does it resolve the ambiguity in this term.  The '998 patent fails to provide any boundaries or parameters on what constitutes the entire field of view.  The '998 patent does not refer to the number of degrees or radians of the field of view that would constitute "all of the perspective view," nor does it specify whether the principle applies to the horizontal field of view, the vertical field of view, or both.  Furthermore, the entire field of view at one moment in time might be different from the entire field of view at a different time or in a different setting, especially if the field of view is configurable by the user.  Accordingly, the scope of the term "all of the perspective view" is indeterminable.

### D.   "Synchronously Disseminating … Positions"

The limitation "*synchronously disseminating* less than all of the positions of the avatars not associated with a particular client process to each of the other client processes" appears in independent claims 9 and 19 and dependent claim 20 of the '690 patent.  As discussed in Activision's claim construction briefs, this limitation is ambiguous because "synchronously" has multiple different meanings and is not explained or defined in the specification of the '690 patent.  D.I. 63 at 32-34 and D.I. 69 at 23-24.  Furthermore, the specification uses the term "asynchronously," but in a way that does not provide any guidance as to the meaning of "synchronously."  *Id*.

For the same underlying reasons, "synchronously disseminating" is indefinite under the new *Nautilus* standard because, when read in light of the specification and the prosecution history, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention. *Nautilus*, Slip Op. at 1.

## IV.   CONCLUSION

Activision respectfully requests that the Court issue a claim construction Order in accordance with the new indefiniteness standard set forth in *Nautilus* and the positions set forth in Activision's claim construction briefs and this supplemental paper.

Respectfully submitted,

Dated:  August 22, 2014                      By: /s/ Matthew J. Moffa
                                             Matthew J. Moffa (*pro hac vice*)
                                             BBO#681965
                                             matthew.moffa@ropesgray.com
                                             Jesse J. Jenner (*pro hac vice*)
                                             jesse.jenner@ropesgray.com
                                             Gene W. Lee (*pro hac vice*)
                                             gene.lee@ropesgray.com
                                             Brian P. Biddinger (*pro hac vice*)
                                             brian.biddinger@ropesgray.com
                                             ROPES & GRAY LLP
                                             1211 Avenue of the Americas
                                             New York, New York 10036-8704
                                             T: (212) 596-9000
                                             F: (212) 596-9050

                                             Samuel L. Brenner (BBO #677812)
                                             samuel.brenner@ropesgray.com
                                             ROPES & GRAY LLP
                                             Prudential Tower
                                             800 Boylston Street
                                             Boston, Massachusetts  02199-3600
                                             T: (617) 951-7000
                                             F: (617) 951-7050

Kathryn N. Hong (*pro hac vice*)
*kathryn.hong@ropesgray.com*
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
T: (650) 617-4000
F: (650) 617-4090

ATTORNEYS FOR DEFENDANTS,
ACTIVISION BLIZZARD, INC.,
BLIZZARD ENTERTAINMENT, INC.
AND ACTIVISION PUBLISHING,
INC.